Below is an Opinion of the Court.

*Randall L. Dunn*
RANDALL L. DUNN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| In Re: | ) | Bankruptcy Case |
| | ) | No. 07-33796-rld7 |
| Valeri G. Caron, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| United States Trustee, | ) | |
| | ) | Adversary Proceeding 08-03065-rld |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION |
| v. | ) | |
| | ) | |
| Valeri G. Caron, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This adversary proceeding was tried before me (the "Trial") on November 12, 2008. In its Complaint, the United States Trustee ("UST") sought to deny a discharge to the debtor, Valeri G. Caron ("Mr. Caron"), pursuant to Sections 727(a)(2)(B), (a)(3), (a)(4)(A), and (a)(5) of the Bankruptcy Code.[1]

---

[1]Unless otherwise indicated, all chapter, section and rule
(continued...)

Page 1 - MEMORANDUM OPINION

During the Trial, I listened carefully to witness testimony and the arguments of counsel. Subsequent to the Trial, I have reviewed my notes from the Trial, the admitted exhibits and the Joint Pretrial Order Re United States Trustee's Complaint for Denial of Discharge ("Pretrial Order"), filed on October 30, 2008 (Docket No. 22). Based on my consideration of the evidence submitted at the Trial and the parties' arguments, I have come to a decision. The findings of fact and conclusions of law stated in this Memorandum Opinion constitute my findings and conclusions for purposes of Fed. R. Civ. P. 52(a), applicable in this adversary proceeding pursuant to FRBP 7052.

I find in favor of the UST and will deny a discharge to Mr. Caron pursuant to § 727(a)(3) of the Bankruptcy Code for the following reasons:

Factual Background

Mr. Caron emigrated to the United States from his native Kazakhstan in 1996. He is bilingual in English and Russian.

Mr. Caron attended high school in his native country, but attended college in the United States. He studied for two years at Pacific Union College and for a further two years at Travel International University of San Diego, where he obtained a degree in business consulting, import laws and logistics in 2002.

Thereafter, Mr. Caron has pursued an eclectic entrepreneurial career. He obtained a small business loan and purchased a beauty salon,

----

[1](...continued)
references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure ("FRBP"), Rules 1001-9037.

Page 2 - MEMORANDUM OPINION

"Hair in Time," in San Diego, while he was in college, that he ran for about two and a half years. He sold the beauty salon for approximately $76,000, paying off the business loan and netting approximately $26,000.

He moved to Oregon and worked for a while as a bus driver for Raz Transportation. Then he went into business with Michael Mitchell and IBD, Inc., a construction company. Mr. Caron's parents refinanced their home, and he and his parents loaned IBD, Inc. $127,378.12. Mr. Caron later discovered that Mr. Mitchell was embezzling money from the corporation. On or about September 26, 2005, Mr. Caron and his parents obtained a confession of judgment against Mr. Mitchell in the amount of $147,087.17 that was to be paid in installments. Mr. Mitchell paid the first installment of $35,000 when the confession of judgment was signed but has made no other payments. Mr. Caron listed a $100,000.00 judgment claim against Mr. Mitchell in his Schedule B. <u>See</u> Exhibit 1, at p. 14.

Meanwhile, Mr. Caron moved on. On August 19, 2004, Mr. Caron incorporated Royal Air Cargo, P.C., a trucking company ("Royal Air Cargo"). He was identified in filings with the Oregon Corporation Division as its president and registered agent. His partner in Royal Air Cargo was Vasiliy Semeniakin. In the Pretrial Order, the parties have stipulated that Mr. Caron understood "what was involved in the day to day running of the trucking company, including supervision of the truckers who worked as independent contractors." Pretrial Order, Exhibit 1, at p. 2. The parties further have stipulated that Mr. Caron "knew and understood how the trucking company obtained orders, how it handled receipts and disbursements, obtained financing from its factoring company, and paid the truckers." <u>Id.</u> However, the books and records for

Page 3 - MEMORANDUM OPINION

Royal Air Cargo were maintained by Mr. Semeniakin's wife, Mariam. Mr. Caron testified that he received no documentation as to Royal Air Cargo's finances, and he never reviewed the books. However, Mr. Caron testified at his § 341(a) meeting that he refinanced a house and invested $119,000 in Royal Air Cargo. <u>See</u> Exhibit 3 at p. 18. Later, he borrowed an additional $60,000 from his parents to invest in Royal Air Cargo. <u>See</u> <u>id.</u>

On October 6, 2005, Mr. Caron and Mr. Semeniakin registered two additional businesses, Royal Air Cargo Freight, LLC, which was to function as a freight brokerage, and Royal Air Cargo Import Export, LLC, which was to conduct an import/export business. Mr. Caron attempted to import mineral and other bottled waters into the United States for distribution, but that venture proved unsuccessful.

By late 2006, Royal Air Cargo and its affiliated enterprises were experiencing grave financial difficulties. In December 2006, Mr. Semeniakin and his wife skipped town, leaving Mr. Caron holding the bag. The Semeniakins' present whereabouts are unknown. Royal Air Cargo's trucks were repossessed in January 2007. Mr. Caron testified at Trial that he attempted thereafter to liquidate the remaining inventories of the Royal Air Cargo enterprises; so, it is unclear from the record when Royal Air Cargo actually ceased operations. No Royal Air Cargo financial records were submitted in evidence, either for the period when Mrs. Semeniakin kept the books or thereafter. In his Schedule B, Mr. Caron listed a "business debt owed" from Mr. Semeniakin in the amount of $119,000.00 as an asset.

At his Rule 2004 examination, Mr. Caron testified that since

Page 4 - MEMORANDUM OPINION

December 1, 2007, he has been employed by CWF, Co., a clothing import business owned by his mother, Vera Caron ("Mrs. Caron"). See Exhibit 4 at pp. 4-5. According to Mr. Caron, CWF, Co. was formed in September or October 2007, and his mother was active in the business as a designer. See Exhibit 4 at p. 6. At her Rule 2004 examination, Mrs. Caron testified that she worked as a care giver, and she had not done any design work in the United States. See Exhibit 5 at p. 4. CWF, Co. has no store or other retail space, and the only funds contributed to CWF, Co. "consist of a few hundred dollars provided by Vera and Kenneth Caron [her husband] for the business registration fee." Pretrial Order, Exhibit 1, at p. 3. However, Mrs. Caron and her husband have been providing Mr. Caron with approximately $3,000 a month to cover his living/business expenses. See Exhibit 5 at pp. 8-9.

During the Trial and in the exhibits, there are limited references to Mr. Caron trying to start up a deli business in the spring and early summer of 2007 and to import medical equipment to the United States, but apparently neither enterprise has proved viable.

However, in addition, there are numerous references and exhibits concerning services performed by Mr. Caron to facilitate currency transactions for Russian friends, acquaintances and/or business associates. Mr. Caron testified during his Rule 2004 examination that he invested some of the money he received and made payments back, but he also used it for business and personal expenses:

> Some of the money--I took it out from there and put in
> a money market--well, again, it's a mess up, I tell
> you. I will be honest. It's a mess up because I kind
> of spread the money because we need for the company,
> and I would need for my personal use. I used his

Page 5 - MEMORANDUM OPINION

1   money for that, and we just would--money went around.
2   Exhibit 4 at p. 73.

3           In his Schedule F, Mr. Caron lists undisputed debts to Feder
4   Trikur in the amount of $15,000, to Slava Sinchuk in the amount of
5   $4,000, and to Igor Smirnov in the amount of $20,000, without providing
6   any address or other contact information.  Ms. Tammy Combs, the UST's
7   bankruptcy analyst with over twenty years' experience working with large
8   and small businesses as an accountant, testified that the bank statements
9   and financial records that were obtained for Mr. Caron reflected
10  unexplained deposits to his accounts totaling $375,208.02.  The only
11  accounting of his currency transactions that Mr. Caron supplied was a
12  two-page, handwritten listing of payments, prepared after the fact, with
13  no dates of transactions and no real accounting as to who was paid and
14  what the listing of transactions meant.  See Exhibit 17 at pp. 2-3.  Ms.
15  Combs testified that she could not ascertain from the Exhibit 17
16  accounting when various funds were received, where they were held or how
17  funds were repaid.

18          In his Statement of Financial Affairs, Mr. Caron listed income
19  from employment or operation of a business of $1,200,000.00 for 2005,
20  $1,600,000.00 for 2006, and $4,000.00 for 2007 up to the date of his
21  bankruptcy filing.  Yet, at his § 341(a) meeting, he testified that he
22  did not have to file a 2006 income tax return because he made less than
23  $10,000, explaining that the $1,600,000.00 figure he used in the
24  Statement of Financial Affairs represented his estimate of Royal Air
25  Cargo's gross income for the year.  See Exhibit 3 at pp. 21 and 29.
26  However, in a residential loan application that Mr. Caron signed on or

Page 6 - MEMORANDUM OPINION

about May 12, 2007, Mr. Caron stated that he was employed as the president of Royal Air Cargo, with gross income of $10,159.00 per month. See Exhibit 13 at pp. 1, 2 and 3.

Mr. Caron acknowledges that he has not kept track of money that he has borrowed from his parents, although he estimates he owes them approximately $280,000-$300,000, "something like that." See Exhibit 4 at p. 100. His parents do not keep track of his borrowings either. See Exhibit 5 at p. 16.

Ms. Combs focused her review and analysis of Mr. Caron's financial information and business transactions on the two-year period from September 2005 through September 2007, the month of Mr. Caron's bankruptcy filing. She testified that after reviewing and analyzing all of the documentation received from Mr. Caron with respect to his financial condition and business affairs, she could not reconstruct his business transactions for 2006 and 2007 and could not reconcile his income and expenses for that period. See Exhibit 25.

Jurisdiction

I have jurisdiction over this adversary proceeding as a core matter under 28 U.S.C. §§ 1334 and 157(b)(2)(J).

Discussion

I.  Generally Applicable Legal Standards

In light of the Bankruptcy Code's objective to provide a "fresh start" for debtors overburdened by debts they cannot pay, I start from the proposition in cases such as this that the provisions of the Bankruptcy Code providing for a denial of discharge are to be construed narrowly in favor of the debtor.

Page 7 - MEMORANDUM OPINION

> A denial of a discharge is an act of mammoth
> proportions, and must not be taken lightly. In light
> of this gravity, this Court and many others have
> stated that Section 727 must be construed liberally in
> favor of the debtor and against the objector.

In re Goldstein, 66 B.R. 909, 917 (Bankr. W.D. Pa. 1986). See First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1342 (9th Cir. 1986); Devers v. Bank of Sheridan, Montana (In re Devers), 759 F.2d 751, 754 (9th Cir. 1985).

The party seeking to deny a discharge to the debtor generally bears the burden of proof. In re Johnson, 68 B.R. 193, 198 (Bankr. D. Or. 1986). Since the Supreme Court's decision in Grogan v. Garner, 498 U.S. 279 (1991), the burden of proof standard for denial of discharge actions under § 727 is preponderance of the evidence. Id. at 286-91.

The relatively lenient burden of proof standard compared with the consistent admonition to interpret the standards for denial of discharge strictly in favor of debtors creates a tension that informs the decision making of bankruptcy courts in § 727 cases. However, ultimately, in spite of whatever weight on the scale favors the debtor's discharge, a party seeking to deny the debtor a discharge under § 727 likely will prevail if the evidence establishes that it is more likely than not that the objecting party's case is justified.

II. Section 727(a)(3)

Section 727(a)(3) denies a discharge to a debtor who "has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was

Page 8 – MEMORANDUM OPINION

justified under all of the circumstances of the case."  Unlike many of
the other discharge denial provisions of § 727, § 727(a)(3) does not
require that the party seeking to deny the debtor a discharge establish
that the failure to keep or maintain adequate financial records was
"knowing" or "fraudulent."  "What constitutes adequate books, documents,
and records must be decided on a case-by-case basis, depending on the
Debtors' business operations and sophistication."  See In re Hirengen,
112 B.R. 382, 385 (Bankr. D. Mont. 1989), and cases cited therein.

          Most of the debtors who appear before me are not great record
keepers.  In fact, in many cases, debtors' failure to maintain clear and
complete records is a factor driving their need to file for relief in
bankruptcy.  Consequently, § 727(a)(3) is not appropriately used as a
trap to deny a discharge to consumer debtors or business operators who
through inadvertence, lack of competence, or both, maintain less than
pristine business records.  However, the Bankruptcy Code does not condone
a complete default in maintaining and preserving records from which basic
information regarding a debtor's business and financial affairs can be
obtained.  As stated by the Ninth Circuit, most recently in Caneva v. Sun
Communities Operating Limited Partnership (In re Caneva), __ F.3d __,
2008 WL 4791680 (9th Cir. Nov. 5, 2008), "the purpose of § 727(a)(3) is
to make discharge dependent on the debtor's true presentation of his
financial affairs."  See Cox v. Landsdowne (In re Cox), 904 F.2d 1399,
1401 (9th Cir. 1990) ("Cox I"), reiterated in Landsdowne v. Cox (In re
Cox), 41 F.3d 1294, 1296 (9th Cir. 1994) ("Cox II").  "'Creditors are not
required to risk the withholding or concealment of assets by the bankrupt
under cover of a chaotic or incomplete set of books or records.'"

Page 9 - MEMORANDUM OPINION

1  <u>Burchett v. Myers</u>, 202 F.2d 920, 926 (9th Cir. 1953), cited in <u>Caneva</u>, __
2  F.3d __, 2008 WL 4791680 (9th Cir. Nov. 5, 2008), and in <u>Cox I</u>, 904 F.2d
3  at 1401.

4      The plaintiff in a § 727(a)(3) action bears the initial burden
5  of proof to establish "(1) that the debtor failed to maintain and
6  preserve adequate records, and (2) that such failure makes it impossible
7  to ascertain the debtor's financial condition and material business
8  transactions." <u>Cox II</u>, 41 F.3d at 1296, citing <u>Meridian Bank v. Alten</u>,
9  958 F.2d 1226, 1232 (3d Cir. 1992).  Once plaintiff makes such a prima
10 facie case, the burden shifts to the debtor defendant to justify the
11 inadequacy or nonexistence of the records.  <u>Id.</u>, and cases cited therein.
12 <u>See</u> <u>Caneva</u>, __ F.3d __, 2008 WL 4791680 (9th Cir. Nov. 5, 2008).

13 III.  <u>The UST's Case</u>

14     During the period from September 2005 through September 2007,
15 Mr. Caron deposited large sums of money, totaling $805,187.22 according
16 to Ms. Combs, in a number of different bank accounts.  <u>See</u> Exhibit 25.
17 From Mr. Caron's testimony and from the admitted exhibits, I find that
18 some of those deposits represented income to Mr. Caron, but other
19 deposits were of funds from his parents, either loaned to Mr. Caron or
20 considered to be his parents' money held with joint access, and funds
21 from individuals from Russia who did business with Mr. Caron in currency
22 transactions.  Other deposits were made of funds received from Mr.
23 Caron's other business enterprises.  These deposits apparently were
24 commingled indiscriminately, without any accounting being provided.  From
25 his various accounts, Mr. Caron made a number of transfers and paid
26 business as well as personal expenses.  Mrs. Caron made withdrawals from

Page 10 - MEMORANDUM OPINION

Bank of America account no. 6832 totaling $39,468 during May and June 2007, some of which were used to make repairs to her home.  Ms. Combs testified that her review of Mr. Caron's account statements showed $130,584.21 in account transfers and $375,208.02 in unexplained deposits.

Mr. Caron testified that he made numerous trips to Russia in 2006 and 2007 to further and explore business opportunities.  He testified that he carried cash with him to cover his expenses.  However, as stipulated by the parties in the Pretrial Order,

> The only records of his travels in 2006 and 2007 which [Mr.] Caron provided to document his use of cash consist of photocopies of a jumble of invoices and receipts arranged haphazardly, some of which are wholly or partially illegible and from which no coherent transactional history may be determined.

Pretrial Order, Exhibit 1, at p. 8.

Ultimately, Ms. Combs testified that she could not reconstruct Mr. Caron's 2006 and 2007 business transactions from the documentation he provided, or otherwise.  In particular, she could not trace or reconcile Mr. Caron's large currency transactions with Russian clients/customers/friends.  There is no way from the evidence before me that I can determine what Mr. Caron's income and expenses were for 2006 and 2007.  I find from the evidence presented that the UST has met its burden of proof to establish that Mr. Caron has not prepared and/or preserved adequate business records to make it possible to ascertain with any degree of accuracy Mr. Caron's financial condition and material business transactions during 2006 and 2007 leading up to his bankruptcy filing in September 2007.

IV.  <u>Mr. Caron's Justifications</u>

Page 11 - MEMORANDUM OPINION

During the Trial, Mr. Caron and his counsel presented three justifications for the clear inadequacy of his business and financial records.

First, with respect to Royal Air Cargo and its related business enterprises, Mr. Caron testified that his partner's wife, Mariam Semeniakin, maintained the Royal Air Cargo books. He was not given access to Royal Air Cargo's financial records. According to Mr. Caron, financial records for Royal Air Cargo were kept by Ms. Semeniakin on her computer. When she and her husband disappeared in December 2006, her computer disappeared with her, leaving inadequate records to prepare tax returns.

I am concerned by the facts that the Royal Air Cargo trucks were not repossessed until January 2007, and Mr. Caron testified that he stored and disposed of Royal Air Cargo inventory thereafter. Yet, no records were presented in evidence with respect to financial transactions for the account of Royal Air Cargo during the period after the Semeniakins left town, when Mr. Caron was in control. I have no clear idea from the evidence presented as to when all Royal Air Cargo business activity ceased, and I note that as late as May 12, 2007, Mr. Caron signed a loan application stating that as president of Royal Air Cargo, his gross income was $10,159.00 per month. See Exhibit 13.

With all that said, if the financial activities of Royal Air Cargo and its affiliated enterprises were the only transactions in issue in this case, I might be inclined to find that adequate justification for Mr. Caron's lack of records for the Royal Air Cargo business was provided from the uncontradicted evidence of the absconding of his business

Page 12 - MEMORANDUM OPINION

partner, Mr. Semeniakin, and his record-keeping wife.  However, Mr. Caron's business activities, particularly with respect to his currency transactions, encompassed large sums of money independent of Royal Air Cargo that cry out for further justification.

Mr. Caron's second justification argument is that he is not an accountant, and he ought not to be held responsible for his inadequate record-keeping in light of his lack of an accounting background.  As I noted at the outset of the Discussion, most chapter 7 debtors who come before me are deficient record keepers, and their record-keeping problems often contribute to their need to seek bankruptcy protection.  Section 727(a)(3) should not be used to deny discharge to the garden variety poor record keeper.  However, my analysis as to the application of § 727(a)(3) is fact dependent in each case and focuses in large part on the relative business sophistication of the debtor whose discharge is challenged.

In this case, Mr. Caron obviously is intelligent, and he has an undergraduate degree in business consulting, import laws and logistics. He ran one small business that he bought during his student years in San Diego, and he ultimately sold that business, paying off his business loan and generating a profit of approximately $26,000.  In spite of Mr. Caron's apparent bad judgment in selecting business partners thereafter, he has engaged in a number of different business enterprises and has substantial experience in working to put together export/import business transactions.  While the evidence before me with respect to Mr. Caron's currency transactions with Russian clients who emigrated to the United States generally does not provide any clear record as to their timing, structure or terms, what is clear is that Mr. Caron handled tens of

Page 13 - MEMORANDUM OPINION

thousands of dollars in such transactions during the period from
September 2005 up to his bankruptcy filing in 2007, and the after-the-
fact purported accounting for such transactions in Exhibit 17 is woefully
inadequate.

One does not have to be an accountant to be able to prepare and
maintain a ledger, showing 1) when and how much money was received from a
particular customer, 2) how the funds were handled or invested, 3) when
and how much money was repaid to each customer, and 4) how much
compensation Mr. Caron received for his services.  I find that a person
as entrepreneurial as Mr. Caron would not perform such services for free.
I further find the virtually complete lack of such records to be
astonishing and ultimately not credible.  Ms. Combs testified that she
found $375,208.02 in unexplained deposits flowing into Mr. Caron's bank
accounts.  His lack of an accounting background does not provide a
justification for his lack of financial records that would allow tracing
of those deposits back to their sources, or to reconcile those deposits
with Mr. Caron's disbursements.  Of particular note in this regard is the
evidence that $117,000 or $126,000 of funds from the sale of a Moscow
apartment by Mr. Feder Trikur was transferred to Mr. Caron through a
Seventh Day Adventist Conference account.  <u>See</u> Exhibit 4 at pp. 60-61.  I
do not find credible the lack of adequate financial records to document
Mr. Caron's currency transactions, and I find that his lack of an
accounting background does not justify the lack of such records.

Finally, in closing argument, counsel for Mr. Caron suggested
that the lack of financial records to document Mr. Caron's business
transactions and his income and expenses might be "cultural."  I note

Page 14 - MEMORANDUM OPINION

1   that Mr. Caron did not submit any evidence, in his testimony or
2   otherwise, tending to indicate that an inability or aversion to
3   maintaining business records was a part of Mr. Caron's cultural
4   background.  In the absence of any such evidence, I am unaware generally
5   of any culture that conducts commerce without some means of recording
6   business transactions.  The practice of keeping records of business
7   transactions goes back at least to pre-cuneiform script on clay tablets
8   in ancient Sumer.  <u>See</u> the entry on "Sumer" in Wikipedia.  I find, based
9   on the record before me, that Mr. Caron's cultural background as a Kazakh
10  emigrant to the United States does not justify his failure to keep and
11  preserve adequate financial and business records in this case.

12                              <u>Conclusion</u>

13          Based on the foregoing findings, I conclude that the UST has
14  presented adequate evidence to support its case under § 727(a)(3) to deny
15  Mr. Caron a discharge for failing to keep and preserve adequate business
16  and financial records to allow creditors and the chapter 7 trustee to
17  ascertain and evaluate Mr. Caron's financial condition and material
18  business transactions.  I further conclude that Mr. Caron has not met his
19  burden of proof to justify the lack of adequate business and financial
20  records.  Accordingly, the UST may present, and I will enter a judgment
21  denying a discharge in chapter 7 to Mr. Caron pursuant to § 727(a)(3).
22  Because I have concluded that Mr. Caron should be denied a discharge for
23  failing to keep and preserve adequate business and financial records, I
24  will not consider or rule on the UST's alternative causes of action to
25  / / /
26  / / /

Page 15 - MEMORANDUM OPINION

deny Mr. Caron a discharge under §§ 727(a)(2)(B), (a)(4)(A), and (a)(5).

Ms. Popperl should submit the judgment within ten (10) days after entry of this Memorandum Opinion.

###

cc:  M. Vivienne Popperl
     Michael A. Day